# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL SWAIN et al., | Case No. CV 12-2168 FMO (JCGx) |
| Plaintiffs, | |
| v. | **ORDER Re: MOTIONS IN LIMINE** |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | |
| Defendants. | |

## BACKGROUND

On January 6, 2012, plaintiffs Daniel Swain and Kathy Swain (collectively, "plaintiffs"), filed a Complaint in Los Angeles County Superior Court against over 40 companies that allegedly manufactured and/or supplied asbestos-containing products to which Daniel Swain was exposed. Crane Co., one of the defendants, removed the case to this court on March 14, 2012. The case is set for trial on October 15, 2013, against three remaining defendants: (1) Carrier Corporation; (2) Crane Co.; and (3) York International Corporation, individually and as successor in interest to Central Environmental Systems, Inc., f/k/a Borg-Warner Central Environmental Systems, Inc., York-Luxaire, Inc., Luxaire, Inc., and The C.A. Olsen Manufacturing Company and d/b/a "Moncrief Furnaces" d/b/a York Heating & Air Conditioning (collectively, "defendants").[1] (See Proposed Final

---

[1] During a pretrial conference on September 27, 2013, plaintiffs informed the court that they reached settlement with defendants Georgia-Pacific LLC f/k/a Georgia-Pacific Corporation and the William Powell Company.

Pretrial Conference Order at 1-2).[2] Plaintiffs are pursuing several claims sounding in negligence and strict liability, which are based on Daniel Swain's exposure to asbestos and the subsequent development of mesothelioma, as well as a claim for loss of consortium regarding Kathy Swain's loss of her husband's companionship and services.

Plaintiffs and defendants have each filed three motions in limine: (1) Plaintiffs' Motion in Limine No. 1 to Exclude "But For" Expert Opinions ("PMIL 1"); (2) Plaintiffs' Motion in Limine Re: Admissibility of Regulations and Findings of Governmental Agencies ("PMIL 2"); (3) Plaintiffs' Motion in Limine No. 3 to Exclude Expert Opinion Evidence that Chrysotile Asbestos Does Not Cause Mesothelioma or, in the Alternative, for Hearing Under Daubert v. Merrell Down Pharms., Inc., and FRE 702 & 703 ("PMIL 3"); (4) Defendants' Motion in Limine No. 1 to Exclude Plaintiffs' Experts' "Every Exposure" Causation Opinions ("DMIL 1"); (5) Defendants' Motion in Limine No. 2 to Exclude or Limit the Testimony of Captain Robert Tolg, Jr. ("DMIL 2")[3]; and (6) Defendants' Motion in Limine No. 3 to Exclude Evidence of Catalogues and Marketing Materials and Other Documents Relating to Products Not at Issue in this Case ("DMIL 3").[4] The court set forth its rulings as to each motion at the pretrial conference held on September 27, 2013. This Order provides more specificity as to the courts' reasoning for its rulings on DMIL 1 and PMIL 3.

## STANDARD OF REVIEW

I.  MOTIONS IN LIMINE

Motions in limine are procedural devices to obtain an early and preliminary ruling on the admissibility of evidence. Although the Federal Rules of Evidence do not explicitly authorize

---

[2] Following the filing of the Proposed Pretrial Conference Order, defendant Kelly-Moore Paint Company, Inc. settled with plaintiffs. (See Defendant Kelly-Moore Paint Company, Inc.'s Notice of Settlement at 1, filed September 24, 2013).

[3] At the September 27, 2013 pretrial conference, the court permitted the parties to file supplemental briefs as to defendants' Motion In Limine No. 2. The court will therefore defer its ruling on that motion until the supplemental briefing is complete.

[4] Defendant's Motion in Limine No. 4 to Exclude Evidence of Studies by Material Analytical Science was withdrawn pursuant to a stipulation filed by the parties on September 13, 2013 and approved by the court on September 16, 2013.

motions in limine, the Supreme Court has noted that trial judges have developed the practice pursuant to their authority to manage trials. See Luce v. United States, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4 (1984). Trial courts have broad discretion when ruling on motions in limine. See Jenkins v. Chrysler Motors Corp., 316 F.3d 663, 664 (7th Cir. 2002). However, a motion in limine should not be used to resolve factual disputes or weigh evidence. See C & E Servs., Inc. v. Ashland Inc., 539 F.Supp.2d 316, 323 (D.D.C. 2008).

To exclude evidence on a motion in limine, the evidence must be "clearly inadmissible on all potential grounds." Ind. Ins. Co. v. Gen. Elec. Co., 326 F.Supp.2d 844, 846 (N.D. Ohio 2004). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." Hawthorne Partners v. AT & T Tech., Inc., 831 F.Supp. 1398, 1400 (N.D. Ill. 1993). This is because although rulings on motions in limine may save "time, cost, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." Wilkins v. Kmart Corp., 487 F.Supp.2d 1216, 1218 (D. Kan. 2007).

Rulings on motions in limine "are not binding on the trial judge [who] may always change his mind during the course of a trial." Ohler v. United States, 529 U.S. 753, 758 n. 3, 120 S.Ct. 1851, 1854 n. 3 (2000). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." Ind. Ins. Co., 326 F.Supp.2d at 846.

II. ADMISSIBILITY OF EXPERT TESTIMONY

"Federal Rule of Evidence 702 allows admission of 'scientific, technical, or other specialized knowledge' by a qualified expert if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002), amended on other grounds, 319 F.3d 1073 (9th Cir. 2003). "The requirement that the opinion testimony 'assist the trier of fact' 'goes primarily to relevance[.]'" Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591,

113 S.Ct. 2786, 2795 (1993)). "Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." Mukhtar, 299 F.3d at 1063.

"*Daubert* provided a non-exhaustive list of factors for determining whether expert testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community." Mukhtar, 299 F.3d at 1064 (italics in original). However, "the inquiry is a flexible one," and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano, 598 F.3d at 564.

In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999), the Supreme Court held that "the *Daubert* frame-work applies not only to scientific testimony but to all expert testimony." Primiano, 598 F.3d at 564 (italics in original). "It emphasize[d], though, that the 'test of reliability is "flexible" and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.' The 'list of factors was meant to be helpful, not definitive,' and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.'" Id. (italics in original) (quoting Kumho Tire, 526 U.S. at 141, 150-51, 119 S.Ct. at 1171, 1175).

"The test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology. Under *Daubert*, the district judge is a gatekeeper, not a fact finder. When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." Primiano, 598 F.3d at 564-65 (internal quotation marks and citations omitted) (italics in original). If the court determines that it has an adequate record before it to make its ruling, it is "not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence." In re Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1138 (9th Cir. 2002) (italics in original).

**DISCUSSION**

I. DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE PLAINTIFFS' EXPERTS' "EVERY EXPOSURE" CAUSATION OPINIONS.

Defendants object to certain language from the expert reports of Dr. Arnold Brody and Dr. Barry Horn. (See DMIL 1 at 1-2). Dr. Brody's report states in relevant part:

> Once a person develops an asbestos-related cancer, it is not possible to exclude any of the person's above-background exposures to asbestos from the causal chain. Each and every exposure to asbestos that an individual with mesothelioma experienced in excess of a background level contributes to the development of the disease. . . . The mainstream scientific community is in consensus that there is no safe level of exposure to asbestos.

(See Declaration of Carlos Guzman in Support of PMIL 3 ("Guzman Decl. re: PMIL 3"), Exh. 2(b)-1 & 2(b)-2 ("Brody Report") at 20-21). In his report, Dr. Horn states as follows:

> In the case of a person who has developed an asbestos-related cancer, it is that individual's cumulative dose which has caused the disease. Lung cancer and mesothelioma are cumulative diseases. As asbestos exposures occur over time, some proportion of those fibers is retained in the lungs and can be translocated to the various sites where the disease develops. Genetic errors caused by asbestos fibers accumulate. Once a person develops an asbestos related cancer, it is not possible to exclude any of the person's above-background exposures to asbestos from the causal chain. Each and every exposure to asbestos that an individual with mesothelioma experienced in excess of a background level contributes to the development of the disease.

(See Guzman Decl. re: PMIL 3, Exh. 2(a) ("Horn Report") at 43).

Defendants request an order precluding plaintiffs' counsel and their experts from expressing an opinion or arguing that every asbestos exposure above background levels is a substantial factor in the causation of mesothelioma. (See DMIL 1 at 1). Defendants argue that the "every

exposure" theory is unreliable under Rule 702 and that it contradicts the California Supreme Court's decision in Rutherford v. Owens-Illinois, Inc., 16 Cal.4th 953 (1997). (See id.).

### A. The Substantial Factor Test.

In Rutherford, the California Supreme Court clarified the standard for proving causation in asbestos cases, stating that "[i]n the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury." 16 Cal.4th at 982 (italics in original). However, "the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff or decedent's *risk* of developing cancer." Id. (italics in original). The court rejected a burden-shifting instruction given by the trial court that required the defendant to prove that its products were not a legal cause of the plaintiff's injuries, once the plaintiff had established exposure to the defendant's asbestos-containing products. See id. at 957.

Contrary to defendants' assertions, the substantial factor test is not incompatible with plaintiffs' experts' "every exposure" opinions. (See DMIL 1 at 6). Indeed, in Rutherford itself, the plaintiff's expert testified to a very similar opinion. See 16 Cal.4th at 961 ("Dr. Allan Smith, a professor of epidemiology, testified that asbestos-related lung cancers are dose-related diseases, and that all occupational exposures through the latency period can contribute to the risk of contracting the diseases."). In holding that the trial court's erroneous burden-shifting instruction did not impair the defendant's ability to put on its full case on substantial factor causation, the court discussed the fact that both parties presented expert medical testimony on the relationship between asbestos exposure and lung cancer, and noted that the plaintiff's expert's opinion was "generally contrary" to the defendant's expert's opinion that brief exposures could be considered insignificant in the context of other heavy exposures. See id. at 983-84 (internal quotation marks

omitted). The court stated that the jury's verdict suggested that "it accepted much of the defense's *factual* theory, concluding that exposure to Kaylo contributed a relatively small amount to decedent's cancer risk, but rejected defendant's argument that such a small contribution should be considered insubstantial." Id. at 985.

Arguably, if the Rutherford court believed that the plaintiffs' expert's opinion was incompatible with the substantial factor standard, the court would not have allowed a jury verdict based on that theory to stand. As the Rutherford court noted, "[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."[5] 16 Cal.4th at 978. While exposure only to background levels of asbestos might be considered negligible or theoretical,[6] an opinion that every exposure to asbestos <u>above background levels</u> is a substantial factor is not inconsistent with this test.[7]

California courts have admitted similar opinions, in one case even by the same expert who will be testifying in this case. In Jones v. John Crane, Inc., 132 Cal.App.4th 990 (2005), Dr. Horn testified that "every exposure, including asbestos releases from defendant's packing and gasket products, contributed to the risk of developing lung cancer." Id. at 999. The court relied on this testimony in finding that the record supported the jury's finding that the plaintiff's exposure to the defendant's products was a substantial factor contributing to his risk of developing lung cancer. Id. The court made clear that "*Rutherford* does not require that each exposure be sufficient to

---

[5] "The term 'substantial factor' has not been judicially defined with specificity, and indeed it has been observed that it is 'neither possible' nor desirable to reduce it to any lower terms.'" Rutherford, 16 Cal.4th at 969. However, the court cautioned that "[u]ndue emphasis should not be placed on the term 'substantial.'" Id. Additionally, the court noted that a standard jury instruction which explains that each concurrent factor contributing to the injury is a legal cause "regardless of the extent to which each contributes to the injury," id. at 984, "remains correct in this context." Id. at 983; see also Lineaweaver v. Plant Insulation Co., 31 Cal.App.4th 1409, 1417 (1995) ("Defendants would not escape liability simply because the precise contribution of each exposure to the disease cannot be determined, but they would be entitled to limit damages assessed against them if they proved the harm was capable of apportionment among them.").

[6] The court does not decide this issue at this time.

[7] Dr. Horn is prepared to testify that the type of work Mr. Swain engaged in (work with gaskets and packing) releases asbestos "at levels 100 to 10,000 times the background level." (Opposition to DMIL 1 ("Opp. to DMIL 1") at 14).

independently cause lung cancer. To the contrary, the exposure need only be 'a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff . . . inhaled.'" Id. at 1000 (quoting Rutherford, 16 Cal.4th at 976) (italics and alterations in original). In a more recent case, Hernandez v. Amcord, Inc., 215 Cal.App.4th 659 (2013), the California Court of Appeal reversed the trial court's grant of nonsuit, holding that the plaintiff presented sufficient evidence that defendant's asbestos-containing product was a substantial factor in bringing about the plaintiff's illness. Id. at 674. The court relied on testimony from an epidemiologist who testified that "if a worker were exposed to many different asbestos-containing products, each of those products would contribute to an increased risk of asbestos-related disease, as long as the asbestos was inhaled and retained in the worker's body." Id.

Courts in other jurisdictions have also admitted the type of expert opinion plaintiffs seek to introduce here. See, e.g., In re Asbestos Litigation, 900 A.2d 120, 138 (Del. Super. Ct. 2006) ("According to Dr. Frank, 'each and every exposure contributes to the disease.' Indeed, according to Dr. Frank, in the causation analysis, if you left out any one exposure among all of the exposures, you would have to leave out all exposures. There is no way to pinpoint one exposure in the causation analysis to the exclusion of others."); McAskill v. Am. Marine Holding Co., 9 So.3d 264, 268 (La. Ct. App. 2009) (noting that the court has "acknowledged certain medical principles regarding asbestos cases. First, brief exposures to asbestos have caused mesothelioma in persons decades later. Second, every non-trivial exposure to asbestos contributes to and constitutes a cause of mesothelioma."); John Crane, Inc. v. Wommack, 227 Ga.App.538, 541 (1997) ("Expert testimony showed that it is universally agreed that asbestos fibers are intrinsically dangerous and that the respiration of each fiber is cumulatively harmful[.]"); Sheffield v. Owens-Corning Fiberglass Corp., 595 So.2d 443, 456 (Ala. 1992) ("[E]vidence that [plaintiff] was 'close' to those who worked with Kaylo insulation on pipes and boilers, coupled with expert testimony that 'each and every exposure to asbestos contributes in a causally significant and substantial manner to asbestos-related lung impairment,' creates a triable issue as to whether airborne asbestos fibers from OCF's product was a substantial factor in producing the disease from which [plaintiff] claims to suffer.").

1     In short, the court is persuaded that plaintiffs' experts' opinions are consistent with the
2 substantial factor standard as interpreted in Rutherford, and do not, as suggested by defendants,
3 "render the 'substantial factor' prong of the causation test meaningless." (DMIL at 9).

4     B.     Plaintiffs' Experts' "Every Exposure" Opinions.

5     Defendants argue that plaintiffs' experts' "every exposure" opinions should be excluded
6 under Rule 702 because they are not reliable. (See DMIL at 1). Expert opinion testimony "is
7 reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the
8 relevant discipline." Primiano, 598 F.3d at 565 (internal quotation marks and citation omitted).

9     Plaintiffs' experts who will put forth the subject opinions are Drs. Brody and Horn. (See
10 DMIL 1 at 1-2). Dr. Brody is an experimental pathologist who "conduct[s] experiments to try to
11 understand on a cell and genetic level, the disease process." (Brody Report at 1). Since the
12 1970s, he has concentrated his research on how asbestos causes lung disease. (See id.). Dr.
13 Brody has published more than 150 articles in peer-reviewed scientific literature dealing with lung
14 cell biology, asbestos, and lung disease. (See id. at 2).

15     Dr. Horn is a pulmonologist (a physician who takes care of people with lung disease or who
16 have disease involving other body parts that affect lung function) and critical care specialist. (See
17 Horn Report at 38). He has treated "an enormous number of people with asbestos-related
18 disease" and takes their work histories so that he may determine their whole asbestos exposure
19 history. (See id. at 40). Dr. Horn has reviewed the literature "in the areas of medical and industrial
20 hygiene regarding work practices that subject individuals to asbestos exposure." (Id.). He has
21 also "reviewed literature in terms of causation of mesothelioma as part of [his] treatment and
22 diagnosis of many, many individuals over the course of [his] practice who suffered from that
23 disease." (Id.). In preparing his expert report, he reviewed Mr. Swain's medical records, (see id.
24 at 1-11), as well as Mr. Swain's deposition testimony. (See id. at 11-35).

25     The body of literature cited by plaintiffs has convinced the court that the knowledge
26 underlying plaintiffs' experts' "every exposure" opinions has a reliable basis. For example, the
27 Consumer Product Safety Commission found in its proposed Rulemaking that "there is general
28 agreement that there is no known threshold level below which exposure to respirable free-form

asbestos would be considered safe." (See Declaration of Carlos Guzman in Support of Opp. to DMIL 1 ("Guzman Decl. re: DMIL 1"), Exh. F at 31). In the article, "Mesothelioma from Chrysotile Asbestos: Update," 21 Annals of Epidemiology 688 (2011), Marty S. Kanarek states that "[t]he authors of multiple studies have shown that all levels of exposure to asbestos can increase the risk of mesothelioma. Because there is no known threshold, then current regulatory levels for asbestos may be capable of mesothelioma carcinogenicity. Brief or low exposures to asbestos are capable of mesothelioma carcinogenicity." (Guzman Decl. re: DMIL 1, Exh. I at 62). Dr. Richard Lemen, a retired Assistant Surgeon General and retired Deputy Director and Acting Director of the National Institute for Occupational Safety and Health, wrote a peer-reviewed article entitled, "Chrysotile Asbestos as a Cause of Mesothelioma: Application of the Hill Causation Model," 10 Int'l. J. Occupational & Envtl. Health 233 (2004). Therein, he stated that "even when potency, on a dose-by-dose basis, is considered, the fact remains that chrysotile is capable of causing mesothelioma and that no safe dose has been identified below which a risk of developing mesothelioma no longer exists." (Guzman Decl. re: DMIL 1, Exh. J at 69).

Dr. Brody's report contains a slide which shows a single chrysotile asbestos fiber interfering with cell division in a mesothelial cell and damaging the DNA contained in the cell, (see Brody Report at Exh. C23), which, if sufficiently replicated in a set of genes that controls cell growth, can cause mesothelioma. (See id. at 9-10). Dr. Horn references two epidemiological studies which found an increased risk of mesothelioma for even very low-dose exposures to asbestos. The first is Klaus Rödelsperger, et al., "Asbestos and Man-Made Vitreous Fibers as Risk Factors for Diffuse Malignant Mesothelioma: Results From a German Hospital-Based Case-Control Study," 39 Am. J. Indus. Med. 262 (2001), which concluded that there is a significantly increased risk of developing mesothelioma even in the lowest exposure group. (See Guzman Decl. re: DMIL 1, Exh. H at 52). The second study is Y. Iwatsubo, et al., "Pleural Mesothelioma: Dose-Response Relation at Low Levels of Asbestos Exposure in a French Population-based Base-Control Study," 148 Am. J. Epidemiology 139 (1998), which found a significant increase in mesothelioma for levels of exposure that were probably far below the limits adopted in most industrial countries during the 1980s. (See Guzman Decl. re: DMIL 1, Exh. G at 32).

To the extent the opinions of the subject experts constitutes a synthesis of the scientific principles regarding asbestos exposure as expressed in the literature, the court is persuaded that there is "a reliable basis in the knowledge and experience of the relevant discipline." Primiano, 598 F.3d at 565. Moreover, courts handling the In re Asbestos Products Liability Litigation multidistrict litigation proceedings have found that opinions, such as those that will be put forth by plaintiffs' experts, comport with Rule 702. In Rabovsky v. Air & Liquid Sys. Corp., 2012 WL 252919 (E.D. Pa. 2012), report and recommendation adopted, 2012 WL 876752, the defendants sought to preclude the plaintiffs' experts, including Dr. Brody, from testifying regarding "every exposure" opinions. See id. at *1. As in this case, the defendants in Rabovsky argued that the experts "failed to support their conclusions with adequate testing." Id. at *3. The court recognized that "testing is not an absolute prerequisite to the admission of an expert opinion. Rather, testing is simply one of many factors to be considered with regard to an expert's testimony." Rabovsky, 2012 WL 252919, at *3 (citing Daubert, 509 U.S. at 593; 113 S.Ct. at 2796) (internal citation omitted); see Primiano, 598 F.3d at 564 ("The 'list of factors was meant to be helpful, not definitive,' and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case.'") (quoting Kumho Tire, 526 U.S. at 150-51, 119 S.Ct. at 1175). Given that "adequacy of testing is merely one of the factors that could be put before the trier of fact," the court concluded that "when considered in relation to the full scope of the three experts' opinions, the questions with respect to the adequacy of the testing do not lead us to exclude their testimony." Rabovsky, 2012 WL 252919, at *3. The court additionally noted that "to the extent . . . lack of testing calls into question the reliability of [the expert's] testimony, such lacunae are best addressed at trial, under cross-examination." Id. (internal quotation marks and citations omitted) (alterations in original).

In Anderson v. Saberhagen Holdings, Inc., 2011 WL 605801 (E.D. Pa. 2011), the court found that plaintiffs' expert's "every exposure" opinion was "sufficiently supported by reliable scientific evidence to be admissible under Rule 702." Id. at *6. It noted that the expert "supported this particular opinion by reference to numerous governmental and organizational standards, as well as the Rodelsperger and Iwatsubo studies," id., which, as noted above, were also relied on

by Dr. Horn. (See Horn Report at 44-45). Finally, in Schumacher v. Amtico, Case No. CV 10-1627, (E.D. Pa. Nov. 2, 2010), the court admitted "every exposure" testimony under Rule 702, and discussed the fact that while "there is a wealth of published literature regarding the 'level' of exposure to asbestos needed to cause mesothelioma[,] . . . there is a bona fide debate within the scientific community regarding what the threshold level is, and indeed, whether a numeric threshold can be ascertained at all. Simply, [plaintiff's expert] takes one position and Defendants' experts take another." Id. at *4 n. 1.

In short, the court finds that plaintiffs' experts' "every exposure" opinions are sufficiently reliable to pass muster under Rule 702. See Primiano, 598 F.3d at 564.

II. PLAINTIFFS' MOTION IN LIMINE NO. 3 TO EXCLUDE EXPERT OPINION EVIDENCE THAT CHRYSOTILE ASBESTOS DOES NOT CAUSE MESOTHELIOMA.

Plaintiffs seek an order precluding "Defendants and their experts, from offering speculative testimony regarding the quantification of asbestos fiber potency, including but not limited to any opinions that each and every exposure to chrysotile asbestos does not increase a person's risk of asbestos disease and more specifically does not increase one[']s risk for mesothelioma." (PMIL 3 at 1). Plaintiffs contend that "[n]one of [defendants'] expert reports cite to factual or scientific foundation sufficient for this Court to allow their opinions regarding the inability of chrysotile asbestos to cause mesothelioma to be admitted at trial[.]" (PMIL 3 at 1).

The only Daubert issue raised by PMIL 3 is whether defendants' experts' opinions are reliable. (See, generally, PMIL 3). Defendants' medical causation experts include: (1) Dr. Michael Graham (see Guzman Decl. re: PMIL 3, Exh. 1a); (2) Dr. James Crapo (see id., Exh. 1b); and Dr. Gerald Myers. (See id., Exh. 1c).

A. Testimony Regarding the Inability of Chrysotile Asbestos to Cause Mesothelioma

Plaintiffs assert that "[n]one of these expert[s'] reports cite to factual or scientific foundation sufficient for this Court to allow their opinions regarding the inability of chrysotile asbestos to cause mesothelioma." (PMIL 3 at 1). They specifically challenge Dr. Crapo's opinion and ask "the Court [to]. . . exclude [his] . . . litigation-driven opinions . . . that chrysolite asbestos does not cause peritoneal mesothelioma." (Id. at 13).

Defendants respond that "Crane's experts are not offering [the] opinion" that "chrysotile asbestos does not cause mesothelioma." (Defendants' Opposition to Plaintiffs' Motion in Limine No. 3 ("Defts' Opp. to PMIL 3") at 2). They also state that "the opinion Plaintiffs' Motion seeks to exclude does not even exist." (Id. at 3). Based on defendants' concession and representation to the court that they will not offer this opinion, defendants' experts are precluded from testifying that chrysotile asbestos does not cause mesothelioma. PMIL 3 is granted as to this issue.

B. <u>Testimony Regarding Quantification, Potency and Threshold of Different Types of Asbestos</u>.

As defendants note, it is not entirely clear whether plaintiffs want the court to exclude defendants' experts' "opinions on fiber potency and the threshold exposure needed for disease." (Defts' Opp. to PMIL 3 at 3-4). Plaintiffs make scattered mention regarding the unreliability of opinions on asbestos fiber potency and the threshold exposure required for disease. (See PMIL 3 at 1, 2, 10, & 12). They broadly object to "opinions that there is a difference in toxicity between chrysotile asbestos and amphibole asbestos," (PMIL 3 at 10), and to any "attempt to quantify any differences in the relative risk of fiber type to cause mesothelioma[.]" (Id. at 12).

Plaintiffs assert that a number of government agencies as well as "each and every scientific group who has studied this issue has agreed with [the International Agency for Research on Cancer ("IARC")]" that "there is no safe level or threshold of acceptable exposure to any type of asbestos fiber below which the risk of contracting mesothelioma will not occur[,]" (PMIL 3 at 2), "including chrysotile asbestos." (Id. at 3). They further assert that, according to the science advisory board of the Collegium Ramazzini, an international academic society comprised of 180 physicians and scientists, any "attempt to quantify any differences in the relative risk of fiber type to cause mesothelioma or lung cancer [is] 'weak and unsubstantiated'[.]" (Id. at 12). Plaintiffs' assertions are unpersuasive.

Plaintiffs fail to cite any authority with sufficient specificity, other than to their own experts' reports, to support their broad contentions regarding the unreliability of defendants' experts' theories. (See, generally, PMIL 3). For example, plaintiffs generally point the court to a 140-page report by the IARC in support of their position, without providing any specific page citations to the

report. (See, generally, PMIL 3 at 2 (citing Guzman Decl. re: PMIL 3 at Exh. 3)). Without specific citations to the report, the court is unable to examine plaintiffs' contentions, short of reading the document in its entirety. The court is not required, and declines to, sift through this and other voluminous documents generally referenced by plaintiffs. See Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001) ("[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein.").

Plaintiffs also object to the opinions of defendants' experts on the grounds that the experts do not "dispute the findings of health agencies around the world," and do "not explain how, given the nature of how asbestos causes cancer, . . . each and every exposure to any asbestos does not present a risk of causing genetic damage and contributing to the DNA errors which lead to cancer." (PMIL 3 at 4-5). Again, plaintiffs fail to cite any authority to support their suggestion that an expert's opinion is not reliable unless the expert also addresses contrary findings or theories. (See, generally, PMIL 3). Also, plaintiffs did not provide any specific citations to defendants' expert's reports or otherwise provide specific guidance to the court to allow an examination of their contentions. It is not the court's burden to comb through the experts' reports to ascertain plaintiffs' allegations. See Integrated Tech. Corp. v. Rudolph Techs., Inc., 2010 WL 8545468, *2 (D. Ariz. 2010) (denying motion in limine and explaining that "[t]he Court will not sift through [an expert's] report to identify failings that [the party] did not point out with specificity").

To the extent plaintiffs rely on their own experts' opinions to contrast and disqualify the reliability of defendants' experts' opinions,[8] (see PMIL 3 at 1-4), such reliance is unpersuasive. "The fact that [p]laintiffs can cite other studies which challenge the studies relied upon by [d]efendants' causation experts does not render their opinions unreliable." Larson v. Bondex Int'l., 714 F.Supp.2d 535, 546 (E.D. Pa. 2010); see Dorn v. Burlington N. Santa Fe R.R. Co., 397 F.3d 1183, 1196 (9th Cir. 2005) (The "determination that the proffered testimony of one expert witness

---

[8] For example, plaintiffs state that their expert, Dr. Horn, "references many case studies and his own work with patients as a basis for his opinion that individuals exposed to low dose chrysotile asbestos are at an increased risk for mesothelioma." (PMIL 3 at 4).

is reliable . . . does not necessarily mean that the contradictory testimony of another witness, concerning the same subject matter but using a different methodology, is not also reliable and helpful.") (internal quotation marks and citation omitted) (emphasis omitted).  Rather, "[a]uthority to determine the victor in such a 'battle of expert witnesses' is properly reposed in the jury."  Humetrix, Inc. v. Gemplus S.C.A., 268 F.3d 910, 919 (9th Cir. 2001).

In any event, defendants have met their burden of showing that their experts' opinions regarding the varying levels of risk and toxicity based on asbestos type have "a reliable basis in the knowledge and experience of the relevant discipline."  Primiano, 598 F.3d at 565.  For example, defendants provided a number of epidemiological publications showing that scientists and professionals in the field recognize and support the challenged theories.  (See, generally, Opp. to PMIL 3 at 4-6, 12).  According to defendants, even the IARC opines that "[t]here are distinct differences in the propensity of the different asbestos fiber types to cause mesothelioma."  (Opp. to PMIL 3 at 4-5; Declaration of Daniel S. Hurwitz in Support of Defendant Crane Co.'s Opposition to Plaintiffs' Motion in Limine No. 3 ("Hurwitz Decl. re: PMIL 3"), Exh. C (IARC, World Health Organization classification of Tumours: Pathology & Genetics, Tumours of the Lung, Pleura, Thymus and Heart, 129 (2004)).[9]

In short, defendants have provided sufficient evidence that opinions concerning the quantification of asbestos potency, as well as varying levels of risk of disease according to asbestos type, have a reliable basis in the field, have been peer-reviewed, and are verifiable.  See Daubert, 509 U.S. at 593, 113 S.Ct. at 2796 ("[A] pertinent consideration is whether the theory or technique has been subjected to peer review and publication.").  As one court in the asbestos products liability multi-district litigation explained, "there is a wealth of published literature regarding the 'level' of exposure to asbestos needed to cause mesothelioma[,] . . . [and] . . . a

---

[9] The IARC publication states that "[a]mphibole (amosite and crocidolite) asbestos is considerably more potent than chrysotile, and crocidolite is more dangerous than amosite."  (Id.). It recognizes that there are different "approach[es] to investigati[ng] the problem" to measure "[t]he exact ratio among these 3 fibres[,]" and acknowledges "a recent report of estimates of cohort, mean fibre exposure suggested a ratio of 500:100:1 (crocidolite:amosite:chrysotile) for relative risk."  (Hurwitz Decl. Re: PMIL 3", Exh. C at 129).

bona fide debate within the scientific community regarding what the threshold level is, and indeed, whether a numeric threshold can be ascertained at all." Schumacher, Case No. CV 10-1627, slip op. at *4, n. 1. "[Plaintiff's expert here] takes one position and Defendants' experts take another[,]" id., which is a matter to be settled by a jury. See Daubert, 509 U.S. at 596, 113 S.Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

**This Order is not intended for publication.  Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion in Limine No. 1 to Exclude Plaintiffs' Experts' "Every Exposure" Causation Opinions **(Document No. 415)** is **denied**.

2. Plaintiffs' Motion in Limine No. 3 to Exclude Expert Opinion Evidence That Chrysotile Asbestos Does Not Cause Mesothelioma Or, in the Alternative, for Hearing under Daubert v. Merrell Dow Pharms., Inc., and FRE 702 & 703 **(Document No. 413)** is **granted in part and denied in part**.

Dated this 1st day of October, 2013.

/s/
Fernando M. Olguin
United States District Judge